Wilfred A. Waltemade, J.
This is a proceeding brought on the petition of a mother for the civil certification of her son *124 (hereinafter designated “ resident ”) to the Narcotic Addiction Control Commission, (hereinafter “NACC”) pursuant to section 206 of the Mental Hygiene Law.
Based upon the petition and oral examination of the mother ■by the court, a warrant was issued pursuant to which the resident was taken into custody and taken to the Edgecombe Reception Center, a facility under the jurisdiction of NACC. The resident was there examined by a physician who certified that this 21-year-old young man was dependent on narcotic drugs.
At the hearing demanded by the resident and held in an open courtroom at his request, the first challenge on constitutional grounds was made to the New York State law, which became effective on April 1, 1967, providing for the compulsory treatment of persons certified as dependent on narcotic drugs. The resident also controverts the medical finding of such dependency.
The mother testified that she was a diabetic and that on a number of occasions the resident had removed her insulin syringe which she had stored in a particular place in their home. She testified to a pattern of needle marks on the inner aspect of the resident’s elbow and to a change in his personality. She discovered little bags or packets made of cellophane or wax paper, containing a white powdery substance which the resident identified to her as “ milk sugar.” The court took judicial notice of the fact that heroin was frequently packaged in small cellophane or wax paper bags and that milk sugar was a common dilutant for heroin. Throughout this period, the resident demanded money from his mother on an almost daily basis — $10, $15, $20 at a time — claiming that he needed it for gambling debts. In recent months, when accused of being on drugs the resident ceased to deny it. Approximately five weeks before testifying, the resident requested his mother to ask their family doctor to give him a prescription for methadone, which is a synthetic narcotic drug. She complied with her son’s request and the doctor did issue such a prescription.
After the mother had petitioned the court for certification of her son to NACO, he was examined by Dr. Tracy Parks, a licensed physician employed by NACO, and whose experience included substantial contact with narcotic addicts. The resident admitted to Dr. Parks that he had been taking heroin up until one month prior to the examination and that since then he had been taking three to four (10 mg.) tablets of methadone each day. Dr. Parks observed needle marks on the inside of both arms of the resident and testified that the resident was nervous and agitated; that this condition was consistent with the rela *125 lively milder withdrawal symptoms, which would be evidenced by an individual when deprived of methadone on which he was dependent.
On the basis of the physical examination and case history furnished by the resident, Dr. Parks rendered his medical opinion that the resident was physically and psychologically dependent upon narcotics.
The testimony of Dr. Parks and the mother and the unequivocal opinion of the doctor establish the resident’s dependency upon narcotics within the definition provided for in subdivision 2 of section 201 of the Mental Hygiene Law.
The resident also contends that the court erred in denying the mother’s later application to withdraw the petition and discontinue this proceeding, and erred'when it rejected testimony concerning the medical treatment available to the resident on a voluntary basis in the community.
Article 9 of the Mental Hygiene Law nowhere provides for the voluntary discontinuance of proceedings thereunder once they are commenced. Whenever there appears to be substantial reason to believe that the resident is an addict within the statute’s definition, the court would be derelict in its duty if it permitted a discontinuance of the proceedings which affect the rights of the public at large.
A consideration of the provisions of 'CPLR 3217 which provides for the discontinuance of an action brought by one person asserting a claim against another for which liability may result, clearly establishes its nonapplicability to the proceedings at bar. In this proceeding, the petitioner asserts no claim against the resident for which he may be liable to the petitioner. Here, the petitioner is merely the conduit through whom these proceedings may be instituted for the benefit of the resident and the people of this State. In any event, it was within the court’s sound discretion to deny the application for a discontinuance.
As for the excluded testimony regarding the medical treatment-available to the resident in the community, such testimony is completely irrelevant to a proceeding, the sole purpose of which is to determine whether the resident is a narcotic addict within subdivision 2 of section 201 of the Mental Hygiene Law, and thereby eligible to be treated in a closed setting for a period not exceeding 36 months.
The very nature of dependency on a narcotic drug mitigates against an addict’s adherence to a voluntary program of assistance as witnessed by the failures of the programs which have heretofore permitted addicts under treatment to discontinue at will, a regimen prescribed to rid them of the drug habit.
*126 The victims of addiction in most instances possess _ impaired judgment and lack the will power to overcome their habit. They require the mandatory life-saving aid now offered for the first time by the wise enactment of the New York State Legislature under the enlightened and dynamic sponsorship of Governor Nelson A. Rockefeller, who inspired the favorable response of the community to the compulsory rehabilitation of those who are so unfortunately addicted. The enforced separation of narcotic addicts from the general population is the only humane and benevolent means to succor and rescue these victims from the mire of their own mental and physical deterioration, while at the same time protecting the bulk of our citizenry from the perils of the depredations of those with uncontrolled and insatiable need for drugs.
The resident raises a number of constitutional objections to the present proceedings, the bulk of which are based on his erroneous assumption that the instant proceedings are criminal in nature rather than civil.
While undeniably the mere labeling of a proceeding as “ civil ” does not make it so, it should be noted that the resident is not housed in any prison, nor is he part of any prison population and indeed section 206-a of the Mental Hygiene Law prohibits his transfer to any correctional institution. The Legislature has expressly provided that all of a resident’s civil rights shall be maintained while he is a member of this compulsory treatment program.
The resident’s rights as a citizen of the United States of America or of the State of New York are not forfeited or abridged, his right to register or vote in any primary, special or general election remains unimpaired, and, 11 nor shall the facts or proceedings relating to the admission, certification or treatment of any such narcotic addict be used against him in any proceeding in any court, other than a proceeding pursuant to the provisions of this article” (Mental Hygiene Law, § 206-b).
'California’s compulsory treatment program for addicts, which is strikingly similar to New York’s legislation, has been recognized by the United States Supreme Court as a civil proceeding in Robinson v. California (370 U. S. 660). While striking down a statute making it a criminal offense to be an addict, the court noted (p. 665) that “ a State might establish a program of compulsory treatment for those addicted to narcotics ”. “ California appears to have established just such a program in §§ 5350-5361 of its Welfare and Institutions Code. The record contains no explanation of why the civil procedures authorized *127 by this legislation were not utilized in the present case.” (p. 665, n. 7; emphasis added).
The California compulsory treatment law which is strikingly similar to New York’s statute was unsuccessfully challenged in case of Matter of De La O (59 Cal. 2d 128, 149, cert. den. 374 U. S. 856). The court there stated that “ we are of the opinion that the demonstrably civil purpose, mechanism, and operation of the program outweigh its external ‘ criminal ’ indicia ’ ’. The criminal indicia included placing the statutory scheme in the California Penal Code and putting the Director of Corrections in control.
New York’s plan lacks these ‘1 criminal indicia.” The provisions of our law on the subject are found in amendments to the Mental Hygiene Law and section 200 spells out the purposes of the new provisions and there is no indication of intent to treat residents as criminals. The manifestly civil purpose and operation of the New York treatment program refutes the resident’s claim that compulsory confinement constitutes cruel and unusual punishment. An examination of section 204 of the Mental Hygiene Law reveals that the Legislature’s goal was to provide for “care, custody, treatment, aftercare and rehabilitation”. Among the avowed purposes of the program, the Legislature stated: ‘1 Experience has demonstrated that narcotic addicts can be rehabilitated and returned to useful lives only through extended periods of treatment in a controlled environment followed by supervision in an aftercare program. The purpose of this article is to provide a comprehensive program of human renewal of narcotic addicts in rehabilitation centers and aftercare programs” (Mental Hygiene Law, § 200, subd. 3). The United States Supreme Court stated that “in the interest of the general health or welfare of its inhabitants, a State might establish a program of compulsory treatment for those addicted to narcotics ” (Robinson v. California, supra, p. 665). The California Supreme Court likewise rejected a claim that compulsory confinement of narcotics addicts constituted cruel and unusual punishment (Matter of De La O, supra, p. 149).
Section 206 (subd. 5, par. b) and subdivision 8 of the same section of the Mental Hygiene Law carefully provide that the period of commitment shall be of unspecified duration, not to éxceed 36 months, and that the addict may be discharged at any, time by the commission as rehabilitated or in an appropriate case by the court upon a writ of habeas corpus. Treatment in the centers is limited to “ accepted medical procedures, tests and treatment” (Mental Hygiene Law, § 206, subd. 3). While hopefully, cures will result, a guaranteed permanent cure is not *128 essential to the constitutionality of the program. (See Robinson v. California, supra, p. 665 [referring only to treatment]; see, also, Matter of De La O, supra; Sas v. Maryland, 334 F. 2d 506.)
Resident’s citation of cases dealing with arrest, search and seizure in criminal proceedings are clearly not applicable. Likewise, claims of violation of resident’s rights under the Fifth Amendment, privilege against self incrimination, and the Sixth Amendment, right to counsel, are without substance or merit. The privilege of self incrimination applies only when, there is a possibility of incrimination.
There can be no self incrimination where immunity is conferred and complete immunity is provided for in the provisions of section 206-b of the Mental Hygiene Law wherein it states “nor shall the facts or proceedings relating to the admission, certification or treatment of any such narcotic addict be u,sed against him in any proceeding in any court ”.
Resident’s constitutional rights to due process were not violated by the medical interview and examination Avhich occurred prior to a full hearing on the question of addiction. Section 206 (subd. 2, pars, a and c) of the Mental Hygiene Law require a verified petition together with a statement of facts upon which the petition is based, plus the judicial option to examine the petitioner in person, before a court order for medical examination is issued. Where immediate action is necessary for the protection of society and for the welfare of the alleged addict, due process does not require notice or hearing as a condition precedent to valid temporary confinement. (Matter of Coates, 9 N Y 2d 242, app. dsmd. sub nom. Coates v. Walters, 368 U. S. 34 [certification to an institution for the mentally ill before a full hearing].) In the instant matter, after the preliminary medical examination, the resident was afforded, pursuant to the statute, a full and complete hearing before this court with counsel of his own choice present, in which the issue of the medical findings was thoroughly litigated. This procedure satisfies the constitutional requirements of due process (Matter of Coates, supra; Dohany v. Rogers, 281 U. S. 362, 369).
There is little doubt that a program of compulsory treatment of narcotic addicts is constitutional. In Robinson v. California (supra), pp. 664^665, the court observed that “ in the interest of discouraging the violation of - such laws, or in the interest of the general health or welfare of its inhabitants, a State might establish a program of compulsory treatment for those addicted to narcotics. Such a program of treatment might require periods of involuntary confinement.” Justice Douglas, concurring, stated (p. 676): “ The addict is a sick person, He may of *129 course, be confined for treatment or for the protection of society.”
The problem of narcotic addiction has become a major National and State problem. “ Narcotic addicts are estimated to be responsible for one-half the crimes committed in the city of New York alone and the problem of narcotic addiction is rapidly spreading in the suburbs and other parts of the state. This threat to the peace and safety of the inhabitants of the state must be met.” (Mental Hygiene Law, § 200, subd. 2.)
The control of contagious diseases, which threaten the health, safety and welfare of the public, has long been recognized as an obligation of government. The incidence of narcotic addiction in this State, which now concededly approximates more than 50,000 persons, and is increasing at the annual rate of 15%, demonstrates that the use of narcotic drugs is contagious. The average user necessarily becomes a peddler to others in order to support his own habit. The problem is so compelling that the State is required to use its police powers in this dramatic new approach toward the alleviation of this condition.
When a subject is within the proper scope of the State’s police power, any exercise of that power is constitutional if there is a rational basis for the legislative act, even where the state of knowledge is uncertain and conflicting theories exist as to the problem’s solution (see, e.g., Jacobson v. Massachusetts, 197 U. S. 11; Buck v. Bell, 274 U. S. 200).
Resident’s final claim that the statutory definition of an addict (Mental Hygiene Law, § 201, subd. 2) is unconstitutionally vague has been answered in detail in People v. Victor (62 Cal. 2d 280) and in Matter of De La O (supra). The court in Victor observed (p. 305) that “ the legislation does not reach such persons until by repeated acts of obtaining, preparing and ingesting an addictive drug they demonstrate that they have failed to resolve their problems by socially acceptable methods and that total addiction is just a matter of time. When that stage is reached, the state has the right and duty to intervene for the protection of the individual in question and of society at large ”.
The definition of an addict under section 6450 of the California Penal Code is substantially similar to that of subdivision 2 of section 200 of the Mental Hygiene Law. The court in Matter of De La O (supra), p. 153 held that “ no more refined definition is constitutionally required. Neither ‘ addicted to ’ nor ‘ imminent danger of becoming addicted ’ are technical terms of art. Words used in a statute are ordinarily to be construed according to the context and ‘ the approved usage of the language * # * and a statute is sufficiently certain if it employs words of long *130 usage or with a common law meaning, ‘ ‘ notwithstanding an element of degree in the definition as to which estimates might differ ” ’
The New York Legislature in article 9 of the Mental Hygiene Law has provided sufficient criteria from which those charged with carrying out its provisions can properly make the determination entrusted to them. Courts have had the occasion to uphold numerous statutes attacked on the grounds of vagueness which were far more questionable than the terms now in dispute (see, e.g., Matter of Bell v. Board of Regents, 295 N. Y. 101 [unprofessional conduct]; Matter of Union Ins. Agency v. Holz, 1 AD 2d 945, mot. for lv. to app. den. 1 N Y 2d 644 [“ untrustworthiness ” of insurance agent]; Matter of Ross v. Macduff, 309 N. Y. 56 [persistent violator]).
On the basis of the foregoing, the court determines that the challenged sections of the Mental Hygiene Law (art. 9 — Drug Addiction) axe not violative of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States of America. In the enactment of article 9 of the Mental Hygiene Law, the State of New York constitutionally exercised its police powers in the protection of its citizenry. The court further finds that the petitioner has proved by a fair preponderance of the credible evidence that the resident is a narcotic addict within the definition of the Mental Hygiene Law (§ 201, subd. 2) and he is certified as such pursuant to section 206 of the Mental Hygiene Law.