Samuel A. Spiegel, J.
The constitutionality of section 206 of the new Mental Hygiene Law, enapted in 1966, for the custody, *515 control, treatment and rehabilitation of narcotic addicts is challenged in this proceeding.
The voluntary commitment aspects of the law are not in issue. The involuntary, or compulsory, commitment is the controversial problem before this court.
The questions to be determined by this court are:
1) Was Paul James deprived of the assistance of counsel for his defense, in violation of the Sixth Amendment?
2) Was Paul James compelled to be a witness against himself, in violation of the Fifth Amendment?
3) Was Paul James denied due process of law, in violation of the Fourteenth Amendment?
The facts are these.
On May 2, 1967, a Justice of this court signed a warrant for the apprehension and detention of Paul James, in lieu of an order, pursuant to section 206 (subd. 2, par. a) of the Mental Hygiene Law. The warrant stated that it was issued upon the petition of Anna James (mother of the alleged addict), based on her declaration that “ it appearing that there are reasonable grounds to believe that such person (Paul James) is a narcotic addict and that such person would not comply with any order this court might issue.” Further, the warrant, which was directed to any peace officer in this State, read as follows: “ Now, therefore, you are commanded to take the alleged narcotic addict herein into custody; to deliver such alleged narcotic addict forthwith for a medical examination pursuant to the New York State Mental Hygiene Law, section 206, to Edgecombe Reception Center, 611 Jerome Avenue, New York City, New York.” The alleged narcotic addict was to be apprehended and delivered to the Edgecombe Reception Center, a New York State narcotic addiction control facility, 1 * for administering of such medical examination; to detain such alleged narcotic addict pending the conclusion of such examination; and to bring such alleged narcotic addict, as soon as practicable after conclusion of such examination, before the Judge or Justice issuing this warrant.” The warrant further provided that the alleged narcotic addict shall not be detained pursuant to this warrant for examination for more than 72 hours from the time of apprehension exclusive of Sundays.
The petition of a relative, or by any person at whose home he resides, or by anyone who alleges that he believes another person is a narcotic addict, may have the accused picked up on a warrant by the police provided that the warrant is issued upon believable reasonable grounds that not only is the person *516 a narcotic addict but also that he would not comply with any order this court might issue.
The first intimation James had of this proceeding was when he was confronted by a police officer with this warrant. The alleged narcotic addict was apprehended by the police officer, taken into custody, detained and then delivered to Edgecombe Reception Center for a medical examination. His freedom was restrained pending the conclusion of such examination. The police officer executing the warrant is obliged to exhibit this warrant to the alleged narcotic addict and to inform him of the purpose for which he is being taken into custody. Whether the police officer fulfilled his obligation was not established at the trial. At any rate, Paul James, not by his choice, was on his way to a State narcotic institution.
This is the proceeding known as an involuntary civil commitment.
On May 2, 1967, Paul James was brought to the Edgecombe Reception Center. On May 3, Dr. Nathan Davis examined and questioned him. Dr. Davis then stated that in his opinion, from the history obtained from the alleged addict and from his physical examination, James should be certified by the court as a narcotic addict as defined in section 201 of the Mental Hygiene Law. The report of the doctor stated that James admitted to him that he had taken heroin; the last time he had a ‘6 fix, ” and that he had been addicted to. drugs. On May 5, 1967, James was brought into court as required by the warrant which permitted detainer up to 72 hours. Pursuant to section 206 (subd. 4, par. a), a statutory notice was read to the alleged addict as to his rights. James then requested a hearing and the assignment of counsel. On that day, a Justice of this court signed an order for a further custody hearing and appointed the Legal Aid as counsel to represent the alleged addict in this proceeding. A hearing was set for May 10, 1967.
On the 10th day of May, 1967, a Justice of this court adjourned this hearing to May 12, and a copy of this order was directed to be served upon Anna James, petitioner and mother of the alleged addict. On May 12, 1967, the case was adjourned to May 15. On May 15, after a hearing, a Justice of this court issued an order certifying the alleged addict to the care and custody of the Narcotic Addiction Control Commission (hereafter referred to as NACO), pursuant to section 206 (subd. 4. par. c) of the Mental Hygiene Law.
Thereafter, and within 30 days, the alleged addict, within his rights, requested another hearing pursuant to subdivision 7 of section 206. The application of Paul James for this second *517 hearing was granted by a Justice of this court on the 26th day of June, 1967. The second hearing was ordered for July 12, 1967. On the 12th day of July, this case was adjourned on consent to the 27th day of July, 1967. The trial began on that day before this court upon the completion of the selection of a jury. On the 31st day of July, the jury rendered a verdict of “Yes” to the propounded question, “Was Paul James a narcotic addict at the time of the medical examination on May 3, 1967.”
Paul James was then recommitted by this court to the care and custody of the NACC subject to the decision to be rendered on the constitutionality of the procedure followed in this case in accordance with the mandate of section 206 of the Mental Hygiene Law pertaining to drug addicts.
In Matter of Spadafora (54 Misc 2d 123), there was published a very erudite opinion by my learned colleague, Mr. Justice Waltemade, wherein he upheld the constitutionality of the new Narcotic Addiction Control Law. My learned colleague, Mr. Justice Postel, in the Gundy case decided on July 20, 1967, likewise upheld the constitutionality of the NACC.
Both of my highly esteemed colleagues declared compulsory rehabilitation to be valid. In issue now, before this court, are the procedures contained in section 206 and followed in this case.
Without question, the growth of narcotic addiction is an extremely critical nationwide problem of major proportions which requires an immediate mobilization of all of our finest medical, psychological, sociological, legislative, administrative and legal talents and resources. Nothing less will suffice.
An analysis of the New York Narcotic Addiction Control Law follows.
Article 9 of the Mental Hygiene Law became effective on April 1,1967. In section 200 we have the declaration of purpose which states the reasons for the enactment of this legislation. This is clear, well-defined and well-intended. Section 201 refers to the definitions used in this article. Section 201-a establishes a State Council on Drug Addiction. It defines the membership, term of office thereof and their powers and duties. Section 202 gives the Commissioner of Mental Hygiene the right to establish a commission known as the Narcotic Addiction Control Commission. Section 203 establishes the Narcotic Addiction Control Commission and explains the term of office, method of appointment and obligations of the members. Section 204 defines the powers and duties of the commission. 'Subdivision 9 of that section gives the NACC the power to establish and operate rehabilitation centers desirable for the care, custody, treatment, *518 aftercare and rehabilitation of narcotic addicts, certified to the care and custody of the commission pursuant to this article. Subdivision 10 of said section gives the power to the commission to establish, maintain, operate and designate medical examinations or other facilities for the alleged narcotic addicts for the purpose of determining whether such persons are addicts and for the care and custody of alleged narcotic addicts, with respect to whom court proceedings are pending. Under subdivision 15, the NACO has the power to conduct private and public hearings, administer oaths, subpoena witnesses, compel their attendance, examine them under oath, require production of any books, records, documents or other evidence. Under subdivision 17, the commission is granted all of the power necessary or proper to effect any and all of the purposes of the commission pursuant to this article. Under said section, the commission is given wide latitude. Those in charge of the institution where the addict is kept are responsible for his care pending a court hearing. They are responsible for his treatment and well-being prior or subsequent to certification as an addict.
Section 205, dealing with special hospital facilities for drug addicts, requires • the Commissioner of Mental Hygiene to set aside different wings or wards or institutions for the exclusive care and treatment of addicts. Section 206 concerns admission of a narcotic addict on court certification. Subdivision 1 gives the County Judge or Supreme Court power over an alleged narcotic addict if he is found within their jurisdiction, except when a criminal proceeding is pending. Paragraph a of subdivision 2 provides that anyone may apply for an order certifying any person to be a narcotic addict. The Judge in lieu of an order, if he believes that there are reasonable grounds and that the alleged addict would not comply with the order, may issue a warrant directing the narcotic addict to be taken to a facility to undergo a medical examination and then to appear before the Judge or Justice not more than five days after the date of examination for a hearing. Paragraph b of subdivision 2 sets forth the required contents of an order. It directs the narcotic addict to appear at a specified time and place and undergo medical examination at a facility and then to appear before the Judge not more than five days thereafter for a hearing. Such order may be served personally on the addict or by registered mail, and the Judge may direct that a copy of such order may be transmitted to the examining facility and to the husband, wife, father or mother or next of kin of the alleged narcotic addict. In the event the addict fails to appear, the Judge or Justice may issue a warrant. Paragraph c *519 of subdivision 2 provides that the warrant issued shall be directed to any peace officer to take the alleged narcotic addict into custody, deliver such alleged narcotic addict forthwith to a specific facility for an immediate medical examination, to bring such alleged narcotic addict after conclusion of the examination not later than five days before the Judge or Justice issuing the warrant or if such Judge or Justice is not available, to another Judge of the county or Supreme Court wherein such warrant was issued. A peace officer shall exhibit the warrant to the alleged narcotic addict and inform him of the purpose for which he is being taken into custody. Unless such warrant is executed within 10 days, it shall be void.
The alleged addict was not picked up by the police on a warrant for failure to comply with any order previously served upon him under section 206 (subd. 2, par b). The warrant issued herein was pursuant to section 206 (subd. 2, par. a) where the Judge or Justice determined that there were “ reasonable grounds to believe that such person is a narcotic addict and further that such person would not comply with any such order the judge or justice shall issue”. Subdivision 3 of section 206 establishes procedures for the medical examination. No direction is contained in this article for the doctor to advise the addict that anything he says may be held against him. Pursuant to section 206 (subd. 4, par. a), the medical report is then transmitted to the court. The court at this point may dismiss the petition if not satisfied with the medical report. If no application is made for a hearing and the court is satisfied that the person is a narcotic addict, the Judge or Justice may immediately issue an order certifying such addict to the care and custody of the NACO for an indefinite period which shall terminate upon either the discharge of such addict as rehabilitated or at the expiration of 36 months. On the other hand, upon demand of the addict or anyone in his behalf, the Judge may issue an order directing a hearing not more than five days of such order which shall be served on all parties interested in the application. At the time of the hearing, the Justice shall hear testimony on the petition and may examine the alleged narcotic addict. The alleged narcotic addict shall have the right to subpoenas for witnesses on his behalf and to cross-examine witnesses. If after the hearing the Judge is satisfied that such person is an addict, he may certify him to the custody of the NACO.
Now, after the apprehension, detention, custody and medical examination by the NACC, the alleged addict is given a copy of the ex parte petition. Heretofore, all he has received is *520 an order, or he has been shown a warrant. Further, this section guarantees him, “ the right to the aid of counsel at every stage of the proceeding.” For the first time, he is advised of his rights after the ex parte commencement of the proceeding, after his apprehension, detention, invasion of privacy, curtailment of his liberty, deprivation of counsel, compulsory medical examination and interrogation during an involuntary custodial confinement. The evidence has already been accumulated against him. Now, he is brought into court and advised of his right to counsel, right to remain silent, and if unable to afford counsel one will be assigned to him. To be significant, counsel must be available “ at every stage of the proceeding,” and can only be available at every stage of the proceeding if he is there at the very inception at the vital and determinative preliminary stages. The accused is then made aware of the charge, of his rights before questioning, examination, and before any admissions are made. James made admissions to the doctor which were used against him at the trial. After he was practically precluded from any defense and his fate was sealed, he was brought into court and advised of his rights.
Subdivision 7 of section 206 provides that a narcotic addict who is certified may seek a “ review of such order ” and shall be entitled to a trial by jury. The interpretation and ruling by me as to the significance of a “ review of such order ” was previously rendered (54 Misc 2d 300). I ruled that a jury could not be vested with power to reverse an order of a Justice of the Supreme Court, but that a “review of such order” was intended to mean a review of the facts upon which such order was based and other pertinent matter.
Section 206-a deals with retention, supervision and transfer of addicts who shall be under the control of the NACC. Section 206-b discusses the preservation of the rights of the addict and guarantees that he shall not forfeit nor shall any of his rights be abridged as a citizen of the United States or of the State of New York.
Section 214 deals with the separability clause which would save the'rest of the act if any portion were declared unconstitutional by this court. The saving clause, section 217, would not impair the validity of anything performed by the commission prior to any amendment.
The California law which served as the model for the New York law has been carefully analyzed. Article 3 of the Welfare and Institutions Code of California provides for the involuntary commitment of persons not charged with a crime. In passing, I might add that sections 5350 through 5361 dealing with civil *521 commitment, discussed in the Robinson case (Robinson v. California, 370 U. S. 660), were repealed in 1965. Instead, in 1965, sections 3100 to 3111 of the Welfare and Institutions Code were enacted by the California Legislature which also eliminated the provisions for the commitment and treatment of addicts from its Penal Law and included them in sections 3100 to 3111 referred to above.
Section 3100 provides that anyone believing a person to be an addict may report the same to the District Attorney who then upon probable cause may petition the Superior Court for commitment of such person to the Director of Corrections for confinement in a Narcotic Detention Treatment and Eehabilitation facility.
Section 3100.6 provides that any peace officer or health officer who has reasonable cause to believe that a person is addicted to the use of narcotics may take the person to the county hospital or other suitable medical institution designated by the Board of Supervisors of the county. The peace officer or health officer shall make a written application to the physician or superintendent in charge of the designated hospital or institution to admit the person believed to be addicted to the use of narcotics and shall state the circumstances under which the alleged addict’s condition was called to the officer’s attention. He shall state the date, time and place of taking the person into custody and the facts upon which the officer has reasonable cause to believe that the person is addicted to the use of narcotics. The alleged addict is to receive a copy of the application prior to his admission to the hospital or institution. Under this section, the alleged addict, within 24 hours, is given an examination to determine if he is addicted to the use of narcotics. If he does not believe so, the physician may then discharge the addict immediately. If after examination he believes that the person is an addict, the physician or superintendent in charge of the hospital has the power to detain the alleged addict for not more than 48 hours for further examination. If the physician after the further examination finds that the person is an addict, he then shall submit an affidavit stating the time and date of admission and the results of the further examination to the District Attorney. The District Attorney then may petition the Superior Court for a commitment of the person to the Director of Corrections for confinement in a narcotic detention and rehabilitation facility. This must be done within 72 hours.
Under section 3102, the court upon receiving the affidavit of the physician and the District Attorney’s petition pursuant *522 to section 3100.6 may order the confined person to he examined by another doctor or to be confined pending a hearing in a county hospital or other suitable institution if said petition indicates that such person is liable to injure himself or others or become a menace to the public.
Section 3102.5 states that a petition shall have the name, title and address of the petitioner, the person’s name who is alleged to be an addict, a statement supporting that belief, other vital statistics as to the address, birth, age, sex, marital status, occupation of the person believed to be a narcotic addict and that he is in need of care, supervision and treatment at the narcotic detention and rehabilitation facility of the State of California.
Section 3103 provides that the service of the petition and order of examination shall be made at least one day before the time of examination fixed by the court order, by delivering a copy of the petition and order for examination personally to such person.
Section 3104 provides that the court shall appoint two medical examiners, and their report shall be submitted to the court. If the report of the examination is to the effect that the person is not addicted, the court shall order the petition dismissed. If the report is to the effect that the person is addicted, then the court shall set a time and place of the hearing and cause notice thereof to be served upon the person.
Section 3105 provides that the court may issue subpoenas for witnesses at the hearing and the person sought to be committed shall have the right to have subpoenas issued for such purpose. The person sought to be committed shall at all stages of the proceedings have the right to be represented by counsel, to present witnesses on his behalf, and to cross-examine witnesses. If he is unable financially to employ counsel, the court shall, if requested, appoint counsel for him.
Section 3106 provides that at the hearing the court shall determine whether the person is addicted to the use of narcotics and if negative he shall be discharged. If affirmative, he shall be ordered committed to the custody of the Director of Corrections.
Under section 3107, a hearing may be waived by the person sought to be committed.
Under section 3108, he may request a hearing by a Judge or jury.
■Under the California law, it is apparent from section 3100 that the person who believes that one is addicted to the use of narcotics must report it to the District Attorney, who may then petition the Superior Court for a commitment of such person *523 for confinement in a narcotic detention treatment and rehabilitation facility.
Under section 3100.6 the physician who finds the person to be an addict reports same to the District Attorney, who then petitions the Superior Court for a commitment of the person for confinement to a narcotic detention treatment and rehabilitation facility.
Section 3100 is an application by the District Attorney based upon information given to him by others. Section 3100.6 differs therefrom in that it is a temporary confinement caused by a police officer or health officer upon reasonable grounds, without court sanction. The District Attorney then seeks commitment by a petition to the Superior Court. Under section 3100.6 the petition for a hearing cannot be heard by the court without an affidavit of the examining physician.
The California law provides involuntary commitment by application to the court by the District Attorney only. The New York law permits application for involuntary commitment, ex parte, to the court by anyone under section 206 (subd. 2, par. a). In California, the District Attorney’s office is an arm of the law with prisoners in custody, because of other crimes, who are addicts. All court applications are screened before they are made to the Superior Court. The California law does not provide for the issuance of a warrant, as does the law in issue. If the District Attorney makes an application to the Superior Court for a commitment, the addict is given a copy of the petition and order of examination at least one day before the examination, pursuant to section 3103.
The same issue presented here appeared in the case of United States v. Wade (388 U. S. 218) decided June 12, 1967. There, the Supreme Court of the United States held that privilege against self incrimination was not violated because of the line-up by the police for identification purposes. However, the court said that this evidence was inadmissible because the line-up was conducted without notice to, and in the absence of, defendant’s counsel. The court (p. 224) further stated in that case, “In contrast, today’s law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused’s fate and reduce the trial itself to a mere formality.” The court also said (pp. 225-226):
“We again noted the necessity of counsel’s presence if the accused were to have a fair opportunity to present a defense at the trial itself:
*524 ‘ The rule sought by the State here, however, would make the trial no more than an appeal from the interrogation; and the “ right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination” . . . “ One can imagine a cynical prosecutor saying: ‘ Let them have the most illustrious counsel, now. They can’t escape the noose. There is nothing counsel can do for them at the trial. ’ ” ’ 378 U. S., at 487-488.”
The right to a hearing granted at this late stage is hollow, meaningless and a mere formality. His certification has been assured by his pretrial medical examination and admissions. It is the prehearing steps which are critical. Any warning thereafter as to his rights is an empty gesture.
In the case of Miranda v. Arizona (384 U. S. 436) the court said the following (pp. 444-445) :
“ the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * *
“ The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. * * * In all the cases, the questioning elicited oral admissions * * * which were admitted at their trials. They all thus share salient features — incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights. ’ ’
Dr. Davis interrogated James, without affording him any warning of his right to remain silent, and then testified to James’s admission that he was an addict.
The court further said in Miranda (supra, pp. 457-458, 459-461, 467-468):
“ The current practice of incommunicado interrogation is at odds with one of our Nation’s most cherished principles■ — that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement *525 obtained from the defendant can truly be the product of his free choice.
* * *
“ Those who framed our Constitution and the Bill of Bights were ever aware of subtle encroachments on individual liberty. They knew that ‘ illegitimate and unconstitutional practices get their first footing * * * by silent approaches and slight deviations from legal modes of procedure. ’ Boyd v. United States, 116 U. S. 616, 635 (1886). The privilege wras elevated to constitutional status and has always been ‘ as broad as the mischief against which it seeks to guard. ’ Counselman v. Hitchcock, 142 U. S. 547, 562 (1892). We cannot depart from this noble heritage.
# # #
‘ ‘ In sum, the privilege is fulfilled only when the person is guaranteed the right ‘ to remain silent unless he chooses to speak in the unfettered exercise of his own will.’ Malloy v. Hogan, 378 U. S. 1, 8 [1964]. The question in these cases is whether the privilege is fully applicable during a period of custodial interrogation. In this Court, the privilege has consistently been accorded a liberal construction. Albertson v. SACB, 382 U. S. 70, 81 (1965); Hoffman v. United States, 341 U. S. 479, 486 (1951); Arndstein v. McCarthy, 254 UI. S. 71, 72-73 (1920); Counselman v. Hitchcock, 142 U. S. 547, 562 (1892). We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak.
* * *
“ Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively *526 apprised of Ms rights and the exercise of those rights must be fully honored.
“ At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.
“ The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given.” (Italics supplied.)
Under the New York Mental Hygiene Law, the procedure for the confinement of the alleged addict is radically different from that for a mentally ill person (§ 78), a dangerous mentally ill person (§ 85), an alcoholic (§ 307), or an inebriate (§ 423).
The court is not called upon to issue an ex parte order or warrant to confine anyone other than an alleged narcotic addict prior to a hearing. There is no provision for an ex parte order or warrant for the apprehension of a person and for his delivery to a detention facility or hospital other than in section 206.
In our criminal court, one accused of the commission of a crime has greater protection than one accused of being an alleged addict. An accused is “booked” at a police station, immediately advised of his rights, and arraigned — all within 24 hours. He is not picked up by legislative fiat and taken directly to a hospital for a physical examination or interrogation without a preliminary hearing and a statement as to his constitutional rights.
Laudable as are the purposes of the NACO, nonetheless, there are changes which should be made in this law. For example, proceedings should be instituted by an order to show cause when a compulsory or an involuntary commitment is sought. The order to show cause should be returnable forthwith in the Supreme Court in the very first instance rather than ordering the accused to be whisked off to a hospital. His rights could then be explained to him then by the court. His constitutional right to remain silent, and his right to advice of counsel would be made clear to him. If funds are not available, Legal Aid should be assigned at that time. He can then be referred for a medical examination, if reasonable grounds that he is an addict are established.
Merely being an addict is not a crime. In Robinson v. California (370 U. S. 660 [1962], supra) the United States Supreme Court declared unconstitutional a California statute making it a criminal offense for a person “to be addicted to the use of *527 narcotics ’ The court in that case said that an addict is a sick person. It would be in the same category of making it a criminal offense for a person to be mentally ill, an inebriate or to be afflicted with a venereal disease. The court decided that even a narcotic addict had civil rights and that an alleged narcotic addict was entitled to due process. In its dicta, the court said that there could be an involuntary civil commitment. This did not sanction an involuntary civil commitment which deprived the alleged addict of his civil and constitutional rights and of due process.
In the Miranda case (supra, pp. 469-471, 476, 478-479, 489, 491) the court said:
“ The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him aware not only of the privilege, but also of the consequences of foregoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system — that he is not in the presence of persons acting solely in his interest.
“ The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today. Our aim is to assure that the individual’s right to choose between silence and speech remains unfettered throughout the interrogation process.
# # *
“ Escobedo v. Illinois, 378 U. S. 478, 485, n. 5. Thus, the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.
& # &
“ An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver.
* * *
“ Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult *528 with a lawyer and to have the latvyer with him during interrogation under the system for protecting the privilege we delineate today.
^ *X:
‘ ‘ The requirement of warnings and waiver of rights is fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.
* * sfr
“ To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.
* # #
“ Similarly, in our country the Uniform Code of Military Justice has long provided that no suspect may be interrogated without first being warned of his right not to make a statement and that any statement he makes may be used against him. Denial of the right to consult counsel during interrogation has also been proscribed by military tribunals.
4N iX5
“ Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them. ’ ’ (Italics supplied.)
In the case of Ex Parte Milligan (71 U. S. 2) the court, on page 132, said: “ The laws which protect the liberties of the whole people must not be violated or set aside in order to inflict, even upon the guilty, unauthorized though merited justice.”
*529 In Matter of Gault (387 U. S. 1, 19-21), Judge Fortas, speaking for the majority opinion, said: ‘ ‘ Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy. Due process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the State may exercise. As Mr. Justice Frankfurter has said: ‘ The history of American freedom is, in no small measure, the history of procedure.’’ But in addition, the procedural rules which have been fashioned from the generality of due process are our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present. It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data. 1 Procedure is to law what ‘ ‘ scientific method ’ ’ is to science.’ ” (Italics supplied.)
The procedure adopted by the Legislature is in issue in the case at bar.
Mr. Justice Fortas continued (p. 36): “ A proceeding where the issue is whether the child will be found to be ‘ delinquent ’ and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution.”
James’ certification as an addict which subjects him to the loss of his liberty, possibly for three years, is comparable in seriousness to a felony prosecution.
Mr. Justice Fortas continuing in the Gault case stated (pp. 47-48):
‘ ‘ The language of the Fifth Amendment, applicable to the States by operation of the Fourteenth Amendment, is unequivocal and without exception. And the scope of the privilege is comprehensive. As Mr. Justice White, concurring, stated in Murphy v. Waterfront Commission, 378 U. S. 52 [1964]:
‘ The privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory * * * it protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used.’ ” (Italics ours.)
The principle of Miranda, Bust, Gault, Escobedo and the protection of the Fifth, Sixth and Fourteenth Amendments can be invoked in any proceeding, including the case at bar.
*530 Mr. Justice Fortas continued in Gault (p. 50):
“For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one’s will, whether it is called ‘ criminal ’ or ‘ civil.’ And our Constitution guarantees that no person shall be ‘ compelled ’ to be a witness against himself when he is threatened with deprivation of his liberty — a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind’s battle for freedom.
* * *
“ Appellants are entitled to these rights, not because ‘ fairness, impartiality and orderliness — in short, the essentials of due process ’ require them and not because they are ‘ the procedural rules which have been fashioned from the generality of due process ’, but because they are specifically and unequivocally granted by provisions of the Fifth and Sixth Amendments which the Fourteenth Amendment makes applicable to the States.” (Italics supplied.)
Since California law has been cited by both sides, the court has done some independent research.
In the case of Matter of Lambert (134 Cal. 626), a law of 1897 authorized a Judge to forthwith determine the question of sanity and immediately commit the person to a hospital on an application of a relative or a friend of an alleged insane person for his commitment to a hospital if accompanied by a certificate of lunacy signed by two medical examiners showing that in their opinion the alleged insane person is actually insane. The court said (p. 628): “An examination of the foregoing provisions of the statute shows that there is no provision for giving to the alleged insane person any notice of the proceedings against him, and that, under its provisions, the first intimation that he may have had thereof may be when the sheriff takes him into his custody under the order of commitment. ’ ’
In the present case, the first intimation James had of this proceeding was when the police officer arrived with the warrant. James had no notice of the application for his commitment. The court went on to say (pp. 630, 631):
< < There should, at least, be the semblance of a judicial investigation of which a public record can be preserved, before a person can be deprived of his liberty. * * #
“It appears from the return in the present case that the application for the order of commitment was made by a person purporting to be a friend of the petitioner, and that it was presented to the judge of the superior court, November 9, 1899, and that upon the same date the order of commitment was made, *531 and the petitioner delivered to the superintendent of the Napa state hospital. ’ ’
The California court (pp. 630-635) cited the case of People ex rel. Sullivan v. Wendel (33 Misc. 496):
“ The relator had been committed to an insane asylum under the provisions of this section, but had had no notice of the application, either personally or by substituted service on any one in her behalf, and there was no hearing at which she was either personally present or represented by any person. The court held that, to the extent that the Insanity Law authorized such proceeding, it was in violation of the constitution, in that it deprived her of her liberty without due process of law, and ordered her release. * * * Much more is there reason for giving him notice of an application to deprive him of his personal liberty. What constitutes due process of law may not be readily formulated in a definition of universal application, but it includes, in all cases, the right of the person to such notice of the claim as is appropriate to the proceedings and adapted to the nature of the case, and the right to be heard before any order or judgment in the proceeding can be made by which he will be deprived of his life, liberty, or property. The constitutional guaranty that he shall not be deprived of his liberty ivithout due process of law is violated whenever such judgment is had without giving him an opportunity to be heard in defense of the charge, and upon such hearing to offer evidence in support of his defense. If his right to a hearing depends upon the will or caprice of others, or upon the discretion or will of the judge who is to make a decision upon the issue, he is not protected in his constitutional rights. (Underwood v. People, 32 Mich. 1.)
* * *
‘ ‘ The law must require notice to him, and give bim the right to a hearing, and opportunity to be heard. The constitutional validity of a law is to be tested, not by what has been done under it, but by what may by its authority be done. (Stuart v. Palmer, 74 N. Y. 188.) ‘ It is not what has been done, or ordinarily would be done, under a statute, but what might be done under it, that determines whether it infringes upon the constitutional right of the citizen. The constitution guards against the chances of infringement.’ (Bennett v. Davis, 90 Me. 105.)
# # #
“ ‘ No matter what may be the ostensible or real purpose in restraining a person of his liberty, whether it is to punish for an offense against the law, or to protect a person from himself, or the community from apprehended acts, such restraint cannot *532 be made permanent or of long continuance, unless by due process of law.’ ” (Italics supplied.)
In the case of Matter of Jones (61 Cal. 2d 325) the order committing him to an institution as a narcotic addict was set aside because he was not present at the time of his hearing. The court found that there was no waiver of his rights in accordance with the statute. Jones had been convicted of a forgery and a civil commitment hearing had been ordered as to whether or not he should be committed as a narcotic addict. In explaining its decision the court said (pp. 327-328):
‘ ‘ The civil commitment proceeding brought pursuant to Penal Code sections 6450 or 6451 is separate and distinct from any pending penal proceeding. The manner in which the civil commitment is commenced is set forth in section 5353 of the Welfare and Institutions Code. Unless the mandatory provisions of this section are substantially complied with, the commitment is fatally defective. The section provides:
“ ‘ The person charged shall be taken before a judge of the superior court, to whom the affidavit and warrant of apprehension shall be delivered to be filed with the clerk. The judge shall then inform him of his rights to make a defense to such charge and to produce witnesses in relation thereto. The judge shall by order fix such time and place for the hearing and examination in open court as will give a reasonable opportunity for the production and examination of witnesses. Such order shall be entered at length in the minute book of the court or shall be signed by the judge and filed and a certified copy thereof shall be served on the person. The judge may order that such notice of the apprehension of the person and the hearing of the charge be served on such relatives of the person known to be residing in the county as the court deems necessary or proper.’
“ The order fixing the time and place for hearing must also state the purpose of the hearing, that is, to determine whether the person charged is addicted to narcotics or in imminent danger thereof. Additionally, proof of service on the person charged must appear of record.
* * *
“ With these provisions in mind we turn to the instant action. The proceedings on April 11th and 12th were clearly illegal.” In the case of Matter of De La O (59 Cal. 2d 128) cited by the NACO, the court declared that compulsory treatment and penal sanctions for failure to comply with any order therefor were valid. It also determined that the period of confinement established by the Legislature was reasonable. However, the court said (p. 146): “ Sections 5053, 5054, and 5055 of the Wei- *533 fare and Institutions Code are part of the general commitment provisions for mentally ill persons (div. 6 pt. 1, ch. 1), and are also incorporated by reference in the Narcotic Drug Addicts Law (Welf. & Inst. Code, § 5354). Taken together, these sections ensure that the constitutional rights of the person to be committed are protected. They provide, for example, that he (1) shall be taken before a judge and informed of his rights, (2) shall be given ample opportunity to produce witnesses in his behalf and compel their attendance by subpoena, including at least two medical examiners, (3) shall be personally present at the hearing in open court, and (4) shall have court-appointed counsel if he is financially unable to employ counsel. Similar commitment steps are spelled out in article 3 of the subject statute (§ 6500-6505), dealing with persons not charged with a crime. ’ ’ The court pointed up the steps taken to insure compliance with the constitutional requirements,
In People v. Nelson (218 Cal. App. 2d 423, 426) the court said:
“ This same result was effected by the Supreme Court in In re Raner [59 Cal. 2d 635'], supra, by analogy in the following quoted language from Matter of Lambert, 134 Cal. 626, 629
nice provision in section 4 for a trial upon the question of his insanity is effective only after the order of commitment has been made, under which the person may have been immediately placed in the hospital, and cannot be made a substitute for his right to have an opportunity to be heard and to defend himself against the charge before being deprived of his liberty.” ’
“ The commitment order is reversed and the defendant is ordered discharged insofar as his custody relates to the proceedings in No. N 28335.”
In Schmerber v. California (384 U. S. 757) heavily relied upon by the NACO, a compulsory blood test was involved. It was held constitutional.
The James case differs in that it involved more than merely compelling the accused to exhibit his body. In the cases of fingerprinting, measuring, photographing or blood-taking, one has been apprehended because of some accident, infraction or violation of the law. The test or statistic sought involves no discretion. It is simply factual. Counsel could not protect, alter, nor serve any useful purpose at these pretrial events, the higher courts have ruled. In the James case, however, he was required to go further. He was obliged to go beyond any of the routine steps. He was detained for three days and placed under custodial interrogation by the doctor. Needless to say, a sick *534 narcotic addict is desperately in need of counsel at this time — even more than a “ fix
The Schmerber decision has not met with universal approval.
In United States v. Wade (388 U. S. 218), decided June 12, 1967 by the United States Supreme Court, Judge Fortas said (pp. 261-262), “ To permit Schmerber to apply in any respect beyond its holding is, in my opinion, indefensible. To permit its insidious doctrine to extend beyond the invasion of the body, which it permits, to compulsion of the will of a man, is to deny and defy a precious part of our historical faith and to discard one of the most profoundly cherished instruments by which we have established the freedom and dignity of the individual.” (Italics ours.)
Mr. Justice Black in Gilbert v. California (388 U. S. 263), decided on June 12, 1967, said (p. 277): “ It is well-established now that the Fourteenth Amendment makes both the Self Incrimination Clause of the Fifth Amendment and Right to Counsel Clause of the Sixth Amendment obligatory on the States. See, e.g., Malloy v. Hogan, 378 U. S. 1; Gideon v. Wammright, 372 U. S. 335.”
In the case of Matter of Raner (59 Cal. 2d 635), the court held that there must be strict statutory compliance. The Supreme Court of California held that the detention of the petitioner as a narcotic addict for six days between the time of his apprehension and commitment was illegal when the petition for commitment was not accompanied by an affidavit of a physician alleging that he had examined Raner within three days prior to filing of the petition for commitment. Such illegality affected the legality of the subsequent order of commitment. In this case the People took the position that the illegality of the petitioner’s detention prior to hearing did not affect the legality of the subsequent order of commitment. The court held that this has no bearing for it is not the illegality of petitioner’s apprehension that is an issue but the illegality of the subsequent detention. Further, the People argued that the application for the writ of habeas corpus contained no allegation that any statements petitioner may have made to the doctors ordered to examine him were involuntary or that any evidence obtained by the doctors during their examination of him was a necessary product of the illegal detention, citing Rogers v. Superior Court (46 Cal. 2d 3). The court said (59 Cal. 2d 640): “ ‘ The right of the patient to remain at liberty with an opportunity to consult with relatives and friends, to receive legal advice, and in other ways prepare for the examination and hearing, is one that should be scrupulously observed by the authorities. * * * ’ ”.
*535 In the case of People v. Victor (62 Cal. 2d 280) the defendant’s addiction problem was not recognized until after he had been convicted of a crime, sentence had been imposed and he had begun to serve his probationary period of confinement in jail. The question of the constitutionality of committing persons who are “ in imminent danger of becoming addicted ” was discussed. Suffice to say the court did not hold this to be unconstitutional in that the words reflected common understanding and were words of long usage, used both in everyday speech and in the law.
In the James case he is not charged with being ‘1 in imminent danger of becoming addicted”. Had he been so charged, I believe I might not follow the reasoning in the Victor case.
To whom are the alleged addicts’ admissions made in the hospital? They are made to a State doctor. This doctor is not the family physician nor a physician of the narcotic addict’s choice. He asks questions and if the addict admits he is a user, the doctor then testifies at the trial against the addict. The alleged addict was not previously warned as to his right to remain silent or for legal representation. The usual privileged communication between physician and patient was completely ignored. The addict has been brought to this doctor under compulsion and makes statements which may lead to his detention up to a period of three years.' The very basic fact is that it is mainly the doctor’s testimony and result of his physical examination which will determine the outcome of any hearing involving the addict.
An interesting case involving rights of people who are detained or in custody is the case of Matter of Rust (53 Misc 2d 51) decided February 2,1967. This case involved admissions obtained by police detectives in a juvenile delinquency proceeding from infants aged 9,10,12 and 13 without any lawyer present. These admissions were suppressed in that they did not meet the requirements of Miranda v. Arizona (384 U. S. 436, 467, supra). The court (pp. 58-fi9) cited the Miranda case and said: “ Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed from being compelled to incriminate themselves.” This quotation indicates that the Fifth Amendment applies in criminal as well as civil proceedings and to children as well as adults. Miranda requires that if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent; the warning must be accompanied by the explanation that any *536 thing said can and will be used against the individual in court; that he must be clearly informed that he has the right to have counsel present at the interrogation, so he can choose between silence and speech; that if the individual wishes the assistance of counsel he must be told that counsel will be appointed for him if he has not the money; that if-at any time during the interrogation he wishes to remain silent, or wants counsel, the interrogation must cease until the counsel is present. There is the additional requirement that the warning must be understood and the waiver voluntary. In addition there is a “ heavy burden ” on the petitioner to show that these elements have been met.”
In the Matter of Bust (supra, p. 59) the court went on to say, ‘ ‘ I would apply the same constitutional requirements of due process ivithout regard to the nature of the proceeding, the standards of proof, or the punishment to follow, where the liberty of an individual is in the balance (cf. Matter of Alaimo, 16 A D 2d 814).” The Miranda case further defines custodial interrogation as “by custodial interrogation we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way ”. The law in the Miranda case was not applied in the James case. The alleged addict, while in the custody of the NACC, was subjected to “ custodial interrogation ”. (Italics ours.)
In the case at bar James was physically and orally examined. Dr. Davis testified that James made admissions that he was an addict. These admissions were introduced in evidence at the trial. The questioning by the doctor went far beyond obtaining information solely for treatment of the addict.
A police officer took James to the hospital instead of to a police station. Should this negate the protection afforded by the Miranda case? We think not.
The Narcotic Addiction Control Commission prepared all the legal forms in use in the courts. They maintain the institutions; control the addict’s treatment; act for the People of the State of New York; supervise the medical examination of the addict, and for all intents and purposes have been empowered by the statute to be in complete charge of the addict’s fate and destiny for three years. NACC is the adversary of the alleged addict in this proceeding. The Attorney-General, the legal arm of the State, represents it. The petitioner initiates the proceeding but the NACC as prosecutor takes over the case upon delivery of the body to the narcotic facility. Does "the name of the agency *537 foil the application of Miranda in that it is NACC instead of District Attorney? We think not.
Control over the alleged addict is by the NACC. He can be detained and deprived of all liberty by them as the result of the examination by the doctor and an admission which is conclusive testimony in court. Is this due process? Was not Miranda intended to cover just such a situation? Is the monumental, intrepid and pre-eminent ultimatum of Miranda to be confined only to an interrogation in a police station? We think not.
James became a prisoner when the warrant was executed by a police officer. He was forcibly taken to the Edgecombe Narcotic Facility. Is it conceivable that the very same procedure condemned in Miranda can be applied with immunity if the interrogation is done in a hospital? Does the name of the building matter? We think not.
James faces involuntary and compulsory incarceration up to three years upon certification as an addict. Are his constitutional rights to be nullified because the People are the complainant via a newly-created State agency, NACC, rather than via a District Attorney? We think not.
Is a narcotic addict who is a sick man and in need of compulsory rehabilitation to be denied the protection of our Constitution? Does the public and legislative sanction of compulsory treatment mean that we ignore the basic human rights of one accused of being an addict?
In our quest for a cure of one accused as an addict, should we neglect to extend to him the same rights afforded to anyone accused of a crime? We think not.
Does the fact that a doctor employed by the NACC conducts the interrogation under similar circumstances condemned in the Miranda case, instead of a lawyer employed by the District Attorney, vitiate the principle of Miranda ? We think not.
Does the fact that James is charged -with a sickness which may subject him to a penalty of detention up to three years instead of being charged with a crime for which he could receive detention, lessen his constitutional rights? We think not.
From all the facts elicited it is clear that the alleged addict was not afforded the safeguards so painstakingly enunciated in the Miranda case.
The intent of the law is good. Governor Rockefeller and the New York State Legislature are to be commended for pioneering trail-blazing legislation to aid the addict and society and for implementing it with an adequate budget. Society, too, wishes to rehabilitate the addict so that the “ habit ” will not compel him to add “ habitual criminal ” to his woe of “ habitual *538 addict ”. Constructive and well intended as this legislation may be for the addict and society, and expedient as it may be for the NACC, nevertheless it must be implemented by a procedure' of due process which complies with the mandates of the laws of our democracy.
The reasonable exercise of police power, inherently necessary in any law enacted for the best interests of the public, presupposes a valid procedure to implement it as well.
The Robinson case (supra) held that compulsory confinement was valid. However, that issue was not before the court. It was purely dicta. Nonetheless, this may be the only way for the addict to 1 ‘ kick the habit ” or “ get the monkey off his back ” and to be restored to society as a healthy, normal and useful citizen. The narcotic addict is to be pitied and not shunned. In an attempt to cure him, we should not foster a worse evil.
In our zealous, paternalistic effort to accomplish a compulsory rehabilitation, we cannot ignore the simple fact that a sick addict has the same inherent constitutional rights and is entitled to the same due process and protection afforded to all healthy people in our democracy. The protection of the Fifth Amendment is available even to an addict.
In Escobedo v. Illinois (378 U. S. 478) one accused of murder was freed because the police did not effectively advise him of his right to remain silent and his right to consult with an attorney.
Can the fact that the NACC is written into the Mental Hygiene Law, rather than into the Penal Code, void the principles of the Miranda case? We think not.
A broad, sound, philosophical edict for the protection of the basic rights of all people, so clearly enunciated by the Supreme Court of the United States in the Miranda case, should not be so limited, restricted, circumscribed, or confined in its application as to exclude an alleged narcotic addict.
As indicated previously, the law should be amended so as to provide that an order or warrant issued by the court should be returnable forthwith in the court, and not at a facility. The alleged addict should be served with copies of all papers and brought to the court, advised of his constitutional rights, of his right to be silent and not to incriminate himself, of his right to counsel and, if financially unable to afford counsel, he should be assigned one without charge at the inception of the proceeding.
The court concludes that the procedure mandated by section 206 of the Mental Hygiene Law for the compulsory apprehension and detention of James, an alleged narcotic addict, on an ex *539 parte application, whether by order or warrant, is clearly in violation of his constitutional rights. The Narcotic Addiction Control Commission is hereby directed to release Paul James from its custody.